IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 8:02CR21 |
| | ) | |
| Plaintiff, | ) | |
| | ) | FINDINGS OF FACT, |
| vs. | ) | CONCLUSIONS OF LAW, |
| | ) | AND |
| SAMSON ALDACO, | ) | ORDER |
| | ) | |
| Defendant. | ) | |

This matter is before the Court for findings of fact and conclusions of law following a nonjury trial held on May 24-26, 31, and June 1, 2005. The following constitute my findings of fact and conclusions of law pursuant to Federal Rule of Criminal Procedure 23(c).

## INDICTMENT

The Defendant, Samson Aldaco, was charged in a two-count Second Superseding Indictment. Count I charges that from at least as early as January, 1999, through December 7, 2001, in the District of Nebraska and elsewhere, Aldaco conspired to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1) and 846. Count II charges that from at least as early as January, 1999, through December 7, 2001, in the District of Nebraska, Aldaco used, brandished, and carried a firearm during and in relation to the offense charged in Count I, and possessed a firearm in furtherance of the crime charged in Count I, in violation of 18 U.S.C. § 924(c).[1] Aldaco pled not guilty to the charges.

---

[1] At trial, the government tailored its evidence to the "use" and "possession" prongs of § 924(c). (*See, e.g.,* Filing No. 279, Tr. 8:9-10.)

**ELEMENTS**

The elements of the conspiracy to distribute or possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine charged in Count I of the Second Superseding Indictment are as follows:

ONE: Beginning from at least as early as January of 1999, through December 7, 2001, two or more persons reached an agreement or came to an understanding to distribute, or possess with intent to distribute, a mixture or substance containing a detectable amount of methamphetamine;

TWO: The Defendant, Samson Aldaco, voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect;

THREE: At the time the Defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding; and

FOUR: The amount of the mixture or substance containing a detectable amount of methamphetamine attributable to the conspiracy charged in Count I of the Indictment was 500 grams or more.[2]

See Eighth Circuit Model Jury Instruction 6.21.846A.1 (2003).

The elements of the crime charged in Count II of the Second Superseding Indictment are as follows:

---

[2]Alternatively, the Court could find that the amount was one of the following: at least 50 but less than 500 grams; or less than 50 grams. 21 U.S.C. § 841(b)(1)(B) & (C).

The crime of possessing a firearm in furtherance of the drug trafficking crime as charged in Count I of the Second Superseding Indictment[3] has two essential elements, which are:

ONE:   The Defendant, Samson Aldaco, committed the crime of conspiracy to distribute or possess with intent to distribute a mixture or substance containing a detectable amount of methamphetamine as charged in Count I of the Second Superseding Indictment; and

TWO:   From at least as early as January of 1999, through December 7, 2001, the Defendant knowingly possessed a firearm in furtherance of the conspiracy as charged in Count I of the Second Superseding Indictment.

Eighth Circuit Model Jury Instruction 6.18.924C (2003).

The phrase "used a firearm" means that the firearm was actively employed in the course of the commission of the crime charged in Count I.  "Active employment" of the firearm must be shown when the case is submitted under the "use" prong of the statute.

---

[3]The Second Superseding Indictment charges this crime in the alternative: using, brandishing, or carrying a firearm during and in relation to the drug trafficking crime charged in Count I; and possession of a firearm in furtherance of the drug trafficking crime charged in Count I.  (Filing No. 198.)  This manner of charging a § 924(c) crime is commonly practiced by the United States Attorney in this district, though the notes accompanying the Eighth Circuit Model Jury Instructions explain that the judicial committee which drafted model jury instruction 6.18.924C believed that United States Attorney offices would "opt for the generally broader 'possess in furtherance' language of the statute in formulating charges in indictments."  Model Jury Instruction 6.18.924C note 4.  The Court notes that, if the decision were made prior to charging a § 924(c) count upon which prong the government intends to rely, the result would be less confusing for parties, the Court, and jurors.  In this case, it is not clear either from the government's trial brief (Filing No. 260) or the government's proposed findings of fact and conclusions of law (Filing No. 286) upon which prong of § 924(c) the government relies.  Therefore, the Court will consider both prongs.

The firearm need not have a role in the crime as a weapon. Eighth Circuit Model Jury Instruction 6.18.924C note 4 (2003).

"Carrying" does not require that the Defendant had the weapon on his person. "Carries," within the meaning of § 924(c)(1), includes carrying a weapon in a vehicle. It is not necessary to show that the Defendant used the weapon in any affirmative manner to prove that the Defendant carried the weapon. A firearm is "carried" during the commission of a crime if a defendant has a firearm on his person or transports a firearm in a vehicle. *Id.*

### "FURTHER FACTUAL" FINDINGS IN THE SECOND SUPERSEDING INDICTMENT

The Second Superseding Indictment also alleges further factual findings, summarized as follows: 1) a drug quantity of 15 kilograms or more; and 2) Aldaco's role as a manager or supervisor, but not as an organizer or leader, of criminal activity that either involved five or more participants or was otherwise extensive.

These further factual findings relate to sentencing guideline factors related to the enhancing factors described in U.S.S.G. §§ 2D1.1(c)(1) (base offense level 38 for a drug quantity involving 15 kilograms or more of a mixture or substance containing methamphetamine) and 3B1.1(b) (three-level offense level enhancement for an aggravating role as described in the requested further factual findings). Under the current state of the law pursuant to *United States v. Booker,* 125 S. Ct. 738 (2005), the issues presented in the further factual findings portion of the Second Superseding Indictment are sentencing issues for the Court to decide by a preponderance of the evidence. Therefore, the Court will not address the further factual findings unless and until these issues become relevant at the time of sentencing.

4

**BURDEN OF PROOF**

The government bears the burden of proving, beyond a reasonable doubt, each essential element of the crimes charged.

***BELL* RULINGS**

Before I address my findings of fact with respect to guilt, I make the following rulings pursuant to *United States v. Bell,* 651 F.2d 1255, 1259 (8th Cir. 1981). The government has proved by a preponderance of the evidence that Dale Herman and Kraig Sperry were members of the conspiracy charged in Count I of the Second Superseding Indictment. The hearsay statements made by these individuals that include, but are not limited to, the following identified by page and line number are admissible under the procedure outlined in *Bell*: 198:3-4 (Herman); 225:2 & 9-10 (Sperry); 227:23-24 (Sperry); 249:4-6 (Herman); 269:23-24 (Herman).

**FINDINGS OF FACT**

Pursuant to Federal Rule of Criminal Procedure 23(c), I find the following:

1. Russell Scott Swanson has been a Douglas County Deputy Sheriff for eleven years. (Tr. 9:8-11).[4] In the course of routine patrol at approximately 3:30 a.m. on December 7, 2001, Swanson saw a blue Ford Mustang with a white top operating without its headlights exit the Kwik Shop at 72nd and Crown Point. (Tr. 9:23-10:5). Deputy Swanson initiated a traffic stop of the vehicle, approached the vehicle and saw three occupants. (Tr. 10:18-11:9). The driver, Samson Aldaco, produced a California identification card. (Tr. 11:10-12; Ex. 1). Enrique Ramirez was the front passenger, and Paul Hernandez was in the back on the passenger side. (Tr. 12:11-14). Swanson used

---

[4]Tr. refers to the trial transcript (Filing Nos. 279-283).

his radio to notify police communications of the location of his stop, the license plate of the vehicle and a vehicle description. (Tr. 13:15-20). Swanson then spoke with Lieutenant Joseph Martinec, and Swanson learned that the persons in the Mustang might have been involved in a South Omaha shooting earlier in the evening. (Tr. 14:10-13; 15:3-5).

    2. Officers were called in to assist before Swanson reapproached the vehicle. Back-up from the Omaha Police Department arrived, including Omaha Police Officer Wayne Melcher. (Tr. 16:1; 27:21-25). The occupants of the vehicle were ordered out and separated. Swanson and Melcher "cleared" the vehicle, ensuring that no other occupants or weapons were in the car or the trunk. (Tr. 17:3-5; 40:19-22). In plain view, Swanson was able to see parts of three handguns; a loaded Sturm Ruger 9mm, a loaded Taurus 9mm, and a .40 caliber Berretta. (Tr. 17:17-23:24). The Ruger was on the back seat next to Hernandez (Tr. 42:16-18), the Taurus was in the front passenger side next to the console (Tr. 43: 13-17), and the Berretta was on the rear floorboard. (Tr. 43:21-24). The weapons were removed from the car, placed on the roof, secured and taken into evidence by Omaha police crime lab technicians. The vehicle was then towed to the police department impound lot. (Tr. 18:5-6; 298:23-307:10). Aldaco was arrested and transported to the police department, where he was later questioned. (Tr. 477:4-6, 17-20).

    3. Retired Omaha Police Officer Wayne Melcher,[5] who worked with the assault/homicide unit, arrived at the scene of the traffic stop at approximately 4:25 a.m. (Tr. 60:10-13; 61:9-11). Aldaco and Hernandez produced identification cards. (Tr. 63:4-6). Judy Kyler of the police department crime lab photographed the vehicle and removed

---

[5] Approximately fourteen months prior to the trial date, Melcher voluntarily retired from the police department after twenty-five years of service. (Tr. 59:21-60:4).

6

physical evidence. (Tr. 64:1-6). The vehicle was towed to the impound lot before it was searched. (Tr. 66:25-67:1). At approximately 3:40 p.m., Melcher took Aldaco to an interview room at the Omaha police station. (Tr. 67:25-69:21). At about 3:50 p.m., Melcher advised Aldaco of his *Miranda* rights and began interviewing him after Aldaco waived his rights. (Tr. 71:3; Ex. 11). Detective Teresa Negron joined Melcher in the interview. (Tr. 68:4-5; 73:22-24). Aldaco stated, among other things, that he had been looking for "Dale," the .40 caliber Berretta handgun was his, and the cell phone that he carried bore the number (620) 521-0689. (Tr. 76:10-11; 77:21; 78:5-7). This interview ended because the officers had no further questions. (Tr. 78:11-14).

    4. On December 7, 2001, at approximately 4:30 p.m., Omaha Police Officer Leland Cass and crime lab technician Todd Petrick searched Aldaco's car pursuant to a search warrant authored by Officer Cass. (Tr. 295:10; 296:21-22; 297:5-7; 314:15-25). During the search they located a loaded .40 caliber magazine (Tr. 300:8; Ex. 29), a loaded 9mm CZ handgun (Tr. 301:19; Ex. 30), and a bag of suspected methamphetamine. (Tr. 304:23; Ex. 16). Officer Cass also found a wallet. (Tr. 318:21; Ex. 33). At first glance, because the wallet appeared to lack evidentiary value, Cass took it to the homicide unit of the Omaha police department's criminal Investigations Bureau. (Tr. 22-321:6). On December 10, 2001, Officer Cass obtained a second search warrant for the vehicle and seized a black leather planner/address book that he recalled seeing on December 7, 2001, when he first searched the car. (Tr. 324:3-325:18; Ex. 35).

    5. The substance was taken to the Eastern Nebraska Forensic Laboratory and tested on January 2, 2002, by forensic chemist Christy Reisen. (Tr. 109:9-10; 25-110:1; 117:20-24). The substance was 17.2 grams of methamphetamine. (Tr. 114:17-19).

6. Business cards found in the wallet included the names Chuck Knight with an address and two phone numbers, the names of Dale and Shauntel with phone numbers, and Pajaro with a phone number. (Ex. 33).

7. The planner/address book found in the vehicle contained storage facility receipts, names and telephone numbers of individuals including Jeff Limely and Randy Moore, and an address for Enrique Ramirez. (Ex. 35).

8. On December 11, 2001, Negron told Melcher that an Immigration and Naturalization Service agent who had spoken with Aldaco contacted her to report that Aldaco again wanted to talk to Negron and Melcher. (Tr. 78:11-79:1). Aldaco was again brought to the police department where he was interviewed. (Tr. 79:4-79:23). During that interview, Aldaco stated that Dale (Herman) owed $12,000 to people in Mexico. Aldaco also said that three weeks before the shooting he came to Omaha with "James." (Tr. 81:2,15-16; Ex. 13, at 140). Aldaco also talked about "Octavio" having a .40 caliber gun, directing drug deliveries, and Dale owing money for drugs. (Ex. 13, at 26, 100, 186, 188). Arrangements were then made for narcotics officers to talk to Aldaco the next day. (Tr. 81-82:15).

9. Omaha Police Officer Stephen Sanchelli[6] was asked on December 12, 2001, to assist in the narcotics aspect of the investigation. (Tr. 383:16-384:3). On that date, Officers Sanchelli, Ferrell and Negron again interviewed Aldaco at police headquarters after Sanchelli advised Aldaco of his *Miranda* rights. (Tr. 384:21-385:5; 386:9-10). Aldaco stated that a friend known to him only as "Pajaro" introduced him to Octavio Molinero in approximately 1999. Pajaro told Aldaco that he and others were involved in transporting

---

[6] Officer Sanchelli voluntarily retired in December of 2003 after over twenty-five years with the Omaha Police Department. (Tr. 383:5-10).

8

marijuana, methamphetamine and cocaine to various cities in the United States. (Tr. 391:10-19; 392: 12-16). Aldaco started working for Pajaro, and his role was to supervise drug shipments from Garden City, Kansas and Mexico and also to supervise the collection of money. (Tr. 391:20-24; 396:23-25). Aldaco's first trip to Omaha was in approximately September of 2000, and he made a total of about seven to eight trips between September of 2000 and August of 2001. (Tr. 392:19-21; 397:6-11). He also delivered or supervised deliveries in Oklahoma, Kansas, Colorado, Missouri and Illinois. (Tr. 398:5-17). Aldaco supervised shipments or delivered the following amounts of methamphetamine to the following individuals between September of 2000 and August of 2001: seven pounds to "Lopez" in Denver, Colorado; three pounds to Randy Moore in Wichita, Kansas; three pounds to William Cheatum in Wichita; three pounds to Reyes-Lopez in Wichita; five pounds to "David" in Omaha; and twelve pounds to "Gabriel" in Omaha. (Tr. 399:3-401:16). Aldaco also stated that he delivered approximately six pounds to Dale Herman between March and November of 2001. (Tr. 395:19-22).

10. Brenda Adams is the general manager for the Quality Inn at 2808 South 72 Street, Omaha, Nebraska. On December 6, 2001, at 4:02 p.m., someone identifying himself as Samson Aldaco, with appropriate identification, checked in and paid cash for a room for one night. At 1:00 p.m. on December 7, 2001, Quality Inn took back the room because no one had paid for its rental. (Tr. 360:9-361:10; Ex. 36).

11. I find the testimony of the following witnesses credible: Deputy Sheriff Swanson; Officer Melcher; Officer Cass; crime lab technician Petrick; forensic chemist Reisen; Officer Sanchelli; and Quality Inn general manager Brenda Adams.

9

12.     In support of my credibility determination as to the witnesses named in the preceding paragraph, I observe that aspects of each witness's testimony were corroborated by: the testimony of other law enforcement and lay witnesses, whether named in the preceding paragraph or unnamed; the testimony of cooperating witnesses; and the evidence.  Corroborated matters include not only the facts of Aldaco's drug transactions, but also details including, but not limited to, details surrounding the drug transactions such as vehicles, times, places, persons present, and associations.

13.    In approximately May 2001, Dale Herman first met Aldaco at Chuck Atkins's auto shop in Omaha.  Atkins rented the shop from Jeff Limely. (Tr. 128:21-129:4).  During their first meeting, Aldaco came in the shop with Gabriel, asked Herman if he would sell methamphetamine for him, and gave Herman a gram of methamphetamine. (Tr. 129:16-130:5).  A few weeks later, Aldaco came to Herman's residence and fronted him eighteen ounces of methamphetamine.  Herman sold between thirteen and fifteen ounces of this methamphetamine to Bernard Benish, and he also "gave" between one-half and one ounce of it to Shauntelle Kerr, between one and two ounces to Chuck Knight through Shari McGuire, and between one-half and one ounce to Rich Graham. (Tr. 132:18-133:17). About four weeks later, Herman and Aldaco went to the long-term parking area at the Omaha airport to pick up Aldaco's Buick Riviera.  They drove to Herman's house, removed the battery and took it into the house.  In the bottom was a hidden compartment, and inside of the compartment was approximately two pounds of methamphetamine and a .380 caliber handgun. (Tr. 135:3-15).  Herman received one pound, which he weighed. (Tr. 21-23). Aldaco stayed in town and drove around with Herman for a few days to supervise Herman's distribution and handling of the cash he received. (Tr. 136:5-8).   In September

10

of 2001, Aldaco again came to Omaha with two pounds of methamphetamine and brought James McKenzie[7] to Omaha to help Herman distribute one pound of the drug. (Tr. 138:18-139:8). Minzey came to supervise Herman in the distribution and to help collect money. (Tr. 139:4-8; 140:19-141:3). In approximately November of 2001, Aldaco enlisted Herman's help in collecting money owed by Knight for one pound of methamphetamine and Shauntelle Kerr for four ounces. (Tr. 141:7-12; 142:4-6). In early December of 2001, Herman witnessed Aldaco selling Knight one pound of methamphetamine. (Tr. 144:15-17; 145:4-12).

14. During the early morning hours of December 7, 2001, Herman next encountered Aldaco at Shari McGuire's house. Two men came in with guns drawn. One of the men was a friend of Aldaco's named Enrique Ramirez, a/k/a "Freaker." (Tr. 148:9-19). Aldaco also appeared with a semiautomatic handgun in each hand. (Tr. 149:7-9; 150:3). When Herman asked Aldaco what was going on, Aldaco told him that things got out of control, it was out of his hands, and Herman had to come up with some money. (Tr. 149:19-20; 150:11-12). Paul Hernandez was also at the house with a gun, and Hernandez told Herman that he had until the next day to come up with $2,000. (Tr. 151:9-11, 22-25). During the commotion, Stace Straw was shot and Aldaco and the others fled. (Tr. 152:3-153:2). Herman fled, as he knew that a warrant was out for his arrest. (Tr. 153:8-11). During the time Herman was associated with Aldaco, Herman received between five and six pounds of methamphetamine from Aldaco. (Tr. 154:10-13).

15. An incident that happened approximately between November 8-13, 2001, Aldaco called Herman, saying that he was parking a car in front of Herman's house. In the

---

[7]McKenzie was later identified as James Minzey. (Tr. 403:4).

front fender was one pound of cocaine and between one and two pounds of methamphetamine. At Aldaco's request, Herman removed the drugs and gave them to Shari McGuire. (Tr. 154:16-155:3; 156:2-3).

16. Shari McGuire met Aldaco through Dale Herman, from whom she bought methamphetamine. (Tr. 196:11-12; 197:19-20). Aldaco would periodically go to McGuire's house to bring Herman methamphetamine, although there were also a few times when Aldaco looked for Herman in order to collect money. (Tr. 199:11-15). Herman moved into McGuire's house during the latter part of October or early November of 2001. (Tr. 199:21-23). Once in November, Herman asked McGuire to hold onto a package because he had to leave town. (Tr. 200:16-201:8). Aldaco then went to McGuire's house asking for the package. Initially McGuire refused to give it to Aldaco until her boyfriend at the time, Charlie Knight, and Herman convinced her to do so. (Tr. 201:17-203:5).

17. During the early morning hours of December 7, 2001, McGuire heard a commotion in her house. (Tr. 204:15). Aldaco approached her carrying a handgun, and he held the gun to her head. (Tr. 205:16-22). She saw Herman on her floor while Freaker held a gun and kicked Herman. (Tr. 206:14-15). Another individual also held a gun to Herman's head and took over kicking him saying "we want the money Dale, we want the money." (Tr. 207:19-208:1). Aldaco then said, "[i]t's out of my hands." (Tr. 208:2-3). Shots were fired, and everyone left the residence. (Tr. 208:23-209:4).

18. James Minzey testified that in May of 2001, Kraig Sperry introduced him to Aldaco so that Minzey could take Aldaco's methamphetamine to Omaha. (Tr. 226:10-227:4). Minzey's first trip to Omaha was in June of 2001, and he went with Sperry. (Tr. 229:17-21). They drove in Aldaco's 1989 Buick Riviera. (Tr. 230:2-5). When they got to

Omaha, they went to a house on Monroe Street. (Tr. 230:7). Minzey stayed in the car while Sperry took the car battery out, went inside the residence, came back out and reinstalled the battery. The car was then taken to the long term parking area at the airport. (Tr. 230:9-21). Minzey's next trip to Omaha was with Aldaco in October of 2001. (Tr. 231:21-23). At that time, Aldaco gave Minzey one pound of methamphetamine to body-carry to Omaha. (Tr. 232:8-25). They traveled in Aldaco's blue Ford Mustang with a white convertible top. (Tr. 233:5-8). Aldaco carried a pistol in his pants. (Tr. 234:1-7). They went to Herman's residence where Minzey gave Herman the pound. (Tr. 234:14-16). Aldaco gave Minzey a .380 caliber handgun and at Aldaco's direction, Minzey stayed in Omaha to receive the money for the methamphetamine that had just been delivered to Herman. (Tr. 235:10-22).

19. In October of 2001, James Michael Willett met Dale Herman and received seven ounces of methamphetamine from him. (Tr. 248:20-249:1). A couple of days after they met, Willett went to Herman to get some more. Herman was out and stated he was waiting for his friend Sam to come to town. (Tr. 249:3-6). A couple of days later, Willett saw Aldaco hand Herman two pounds of methamphetamine. Herman then gave Willett a half pound of that quantity. (Tr. 252:1-253:3).

20. Charlie Knight met Dale Herman through Shari McGuire in September of 2001. Knight then met Aldaco through Herman. (Tr. 269:1-8). On one occasion, Knight was at Herman's house when Herman was waiting for his supplier to bring drugs. Aldaco came to the house. After Aldaco left, Herman described Aldaco as "Sam," the guy he was getting his dope from. (Tr. 269:19-24). Herman delivered a total of five ounces of methamphetamine to Knight. (Tr. 270:12-25). Thereafter, Aldaco asked Knight if he

13

wanted to "work." (Tr. 272:2-6). Knight agreed and over the course of the next few days, Knight sold a half-pound, a quarter-pound and three ounces of methamphetamine for Aldaco. (Tr. 272:15-273:13). Aldaco told Knight to contact him when he needed more methamphetamine, leaving Knight his telephone number. Aldaco left his phone number with Knight. (Tr. 273:17). The phone number was found when a search warrant was executed at Knight's residence on December 14, 2004. (Tr. 274:4-15; 278:25-279:1; Ex. 27).

21. A couple days after Aldaco left, Knight called and asked for a pound of methamphetamine. (Tr. 275:13-15). Aldaco brought Knight one pound. (Tr. 275:19-20). When Knight sold that pound and contacted Aldaco, Aldaco brought Knight another pound. (Tr. 276:5-6). This time Aldaco brought "Freaker," who Aldaco said would make future deliveries from Aldaco to Knight. Aldaco also instructed Knight to contact Freaker in the future. (Tr. 276:5-17). Knight did so, and Freaker brought him more than four pounds of methamphetamine. (Tr. 276:20-277:14). Prior to the execution of the search warrant at Knight's residence, Aldaco had brought a hollowed out battery to Knight's residence and asked Knight to keep it because it was "very valuable" because it was used for smuggling methamphetamine. (Tr. 279:25-280:19; Ex. 26).

22. Knight also testified to his involvement in a 2001 deal between McGuire, Herman and Aldaco. When Aldaco wanted to obtain a pound of cocaine and a pound of methamphetamine that he had left with Herman for safe-keeping, Knight called McGuire and convinced her to give the drugs to him so that he could return them to Aldaco. (Tr. 282:5-283:21).

23. Knight, McGuire, Herman, Minzey and Willett all signed plea agreements. Each had an incentive to provide truthful information to law enforcement in order to receive consideration for a downward departure from their applicable sentencing guideline ranges and/or their statutory mandatory minimum sentences. (Ex. 25, 20, 17, 21, 22).  These witnesses had no incentive to provide false testimony, because it was made apparent to them that if they gave false testimony they would not be eligible to have their sentences lowered.  Each witness's plea agreement clearly indicates that no promises were made guaranteeing the witness a downward departure as a result of testimony given in this case.

24. In support of my credibility determination with respect to the cooperating witnesses, I observe that aspects of each witness's testimony were corroborated by the testimony of other cooperating witnesses, law enforcement, other witnesses, and other evidence.  Corroborated matters include not only the facts of Aldaco's drug transactions, but also details including, but not limited to, those surrounding the drug transactions such as vehicles, times, places, persons present, and associations.

25. I find the testimony of Samson Aldaco not credible.  In support of this determination, I note the lack of corroboration of facts or other details testified to either through the testimony of other witnesses or evidence.  I also observe that Aldaco has substantial motivation to provide false testimony.

**FINDINGS WITH RESPECT TO GUILT**

With respect to Count I of the Second Superseding Indictment, I find that the Defendant, Samson Aldaco, is guilty of Count I of the Second Superseding Indictment, as each element of the offense has been proved beyond a reasonable doubt.  Specifically, I find that from at least as early as January of 1999, through December 7, 2001, Samson

Aldaco knowingly and intentionally conspired with Charlie D. Knight and other persons to distribute and possess with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1) and 846.

With respect to Count II of the Second Superseding Indictment, I find that the Defendant, Samson Aldaco, is guilty of Count II of the Second Superseding Indictment, as each element of the offense has been proved beyond a reasonable doubt. Specifically, I find that from at least as early as January of 1999, through December 7, 2001, Samson Aldaco: used and carried a firearm during and in relation to the drug trafficking crime set forth in Count I of the Second Superseding Indictment; and possessed a firearm during and in relation to the drug trafficking crime set forth in Count I of the Second Superseding Indictment, in violation of 18 U.S.C. § 924(c).

IT IS ORDERED that a separate Order on Sentencing Schedule will be issued.

DATED this 9th day of November, 2005.

BY THE COURT:

s/Laurie Smith Camp
United States District Judge